IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 4, 2022

## CHRISTOPHER BROWN v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 13-05989        J. Robert Carter, Jr., Judge**

_____

### No. W2021-01331-CCA-R3-PC
_____

The Petitioner, Christopher Brown, was convicted of one count of first degree murder and three counts of aggravated assault by a Shelby County jury. The Petitioner later filed a petition for post-conviction relief alleging that he was denied the effective assistance of counsel when trial counsel failed to disclose discovery materials and failed to call particular witnesses. The post-conviction court denied the petition after an evidentiary hearing. On appeal, we affirm the judgment of the post-conviction court.

**Tenn. Rule App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TOM GREENHOLTZ, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and J. ROSS DYER, JJ., joined.

Shae Atkinson, Memphis, Tennessee, for the appellant, Christopher Brown.

Herbert H. Slatery III, Attorney General and Reporter; Hannah-Catherine Lackey, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTUAL BACKGROUND

Following a jury trial, the Petitioner was found guilty of first degree murder and three counts of aggravated assault, and he received a total effective sentence of life imprisonment plus ten years. *State v. Brown*, No. W2015-00990-CCA-R3-CD, 2016 WL 1446221, at *1 (Tenn. Crim. App. Apr. 12, 2016), *perm. app. denied* (Tenn. Sept. 22,

- 1 -

2016). On the Petitioner's direct appeal, this Court summarized the proof introduced at his trial:

At trial, Carolyn Pratcher testified that the [Petitioner] was the father of her thirteen-year-old son. She acknowledged that her relationship with the [Petitioner] had been a difficult one. She stated that she lived with the [Petitioner] until 2013, when he kicked her out of their house on Hanley Street. Carolyn recalled that, before moving to Hanley Street, she and the [Petitioner] had lived at Kingsgate Apartments in 2011. In October of that year, she and the [Petitioner] had a disagreement that turned physical. Carolyn explained that there had been an apartment on fire next door and, when she told the [Petitioner] about it, he said, "B* * * *, I told you to stay out of other people's business." The [Petitioner] started pulling her hair and dragging her upstairs. Although she got away from the [Petitioner] and ran out the door, she did not want to leave her children there and went back for them. Her sixteen-year-old son eventually called the police, and the [Petitioner] was arrested and later convicted in connection with the assault.

Carolyn recalled that sometime after this incident, she moved to Hanley Street with the [Petitioner]. However, in June 2013, the [Petitioner] "put [her] out," and she moved in with Mr. Fips, who lived four or five houses down from the [Petitioner]. Carolyn testified that the [Petitioner] began "sending text messages, threatening messages." She also recalled that, on one occasion after she moved in with Mr. Fips, the [Petitioner] came into Mr. Fips's house unexpectedly. Mr. Fips told the [Petitioner] to walk outside so they could talk. Once outside, the two men "had words," but they did not have a physical confrontation. Carolyn also stated that, around June 7, 2013, Mr. Fips's tires were slashed. The [Petitioner] later admitted to Carolyn that he slashed Mr. Fips's tires.

Carolyn stated that she had additional problems with the [Petitioner] on June 17, 2013. She explained that the [Petitioner] called her and said that he was going to give her some money for their son's birthday. However, when she went to the [Petitioner]'s house to get the money, the [Petitioner] grabbed her around the neck and tried to drag her into the house. The [Petitioner] told her, "I'm going to get [your] a* *[.]" Carolyn recalled that the [Petitioner] only let her go when their son ran across the street. She stated that she had no physical injuries from this incident.

Carolyn testified that, on June 22, 2013, she went to the dog track with Mr. Fips; her aunt, Ida Pratcher; and another man, Michael Douglas. The group left the dog track between 9:00 p.m. and 10:00 p.m. Upon returning

to Memphis, they stopped at Church's Chicken and a convenience store. Carolyn recalled that Mr. Fips was driving his SUV when they turned onto Hanley Street and she was sitting in the front passenger seat. As Mr. Fips drove past the [Petitioner]'s residence, Carolyn saw the [Petitioner] sitting on his front porch. She recalled that Mr. Fips was driving past the [Petitioner] "slowly" but that they did not say anything to the [Petitioner]. The [Petitioner] got off the porch and walked towards Mr. Fips's vehicle, shining a light from his cell phone towards them. Carolyn stated that, when Mr. Fips saw the light, he put the vehicle in reverse and backed up. Mr. Fips rolled the driver's side window down and told the [Petitioner] that he wanted to speak with him "man to man" about the text messages that the [Petitioner] sent him. Carolyn testified, "[T]hat's when all the shooting just started." She explained that the [Petitioner] stood about ten to fifteen feet away when he began shooting and that he shot into the vehicle approximately five times. Carolyn stated that neither she nor anyone else in Mr. Fips's vehicle had a weapon. Moreover, Mr. Fips did not own a gun and was not known to carry a gun.

Carolyn recalled that, when she heard the shots, she felt her arm "hurting and burning real bad" and that she tried to get out of the vehicle but that the door would not open. Carolyn said that Mr. Fips attempted to "drive off" but that he did not "make it in time enough." When she got her car door open after the third or fourth try, Carolyn got out of the SUV and stood beside it. She wanted to reach in for Mr. Fips, who was not moving, but she was afraid that the [Petitioner] would shoot her again, so she ran behind an abandoned house. Carolyn recalled that the [Petitioner] chased her around the abandoned house several times. She had been shot twice, was losing a lot of blood, and felt like she was going to pass out, so she stopped running. At that time, the [Petitioner] caught up to her and grabbed her "around [the] neck." He had something in his hand, but she could not tell if it was a knife or a gun. Carolyn testified that there were people outside, and some were calling 911. The [Petitioner] let her go and ran from the scene before police arrived. Carolyn spoke briefly to police and was then taken to the hospital.

According to Carolyn, the [Petitioner] called her from California a couple of weeks after the shooting. During the call, the [Petitioner] stated that he used a .22 to shoot her and Mr. Fips. The [Petitioner] called Carolyn a second time after he was arrested and placed in jail. During the phone call, the [Petitioner] encouraged her to change her story and tell police that Mr. Fips had a gun and that "it was self[-]defense."

On cross-examination, Carolyn acknowledged that there were other ways to get to Mr. Fips's house that did not involve driving past the [Petitioner]'s residence. She stated that, although Mr. Fips drove slowly down Hanley Street, he was not looking for the [Petitioner]. She agreed that Mr. Fips was upset with the [Petitioner] about the text messages that the [Petitioner] had sent. She stated that Mr. Fips put his SUV in reverse and then in park and rolled his window down "the rest of the way" before he asked the [Petitioner] if they could talk.

Carolyn's aunt, Ida Pratcher, testified that on the day of the shooting she went to a casino in Arkansas with Carolyn, Mr. Fips, and Michael Douglas. Ida recalled that the group stayed at the casino for about an hour and a half and then returned to Memphis around 10:00 p.m. On the way home, Mr. Fips stopped at a store and at Church's Chicken. Ida recalled that, as Mr. Fips drove down Hanley Street, she saw the [Petitioner] sitting on the porch of his house. When Mr. Fips saw the [Petitioner], he said, "[d]amn," stopped the vehicle, and starting backing up. Mr. Fips said that the [Petitioner] wanted to talk to him, and when Mr. Fips stopped, the [Petitioner] came off the porch towards them. Mr. Fips asked the [Petitioner] why the [Petitioner] was following him and texting his phone. Ida stated that Mr. Fips was "fixing to open the door," and she thought that the [Petitioner] came to the truck and "pushed, shut the door back up." According to Ida, the [Petitioner] told Mr. Fips, "I told you mother f* * * * * when I see you . . . mother f* * * * * when I texted you I told you mother f* * * * * when I see you again, I'm going to kill you." Then, the [Petitioner] "started shooting." Ida testified that she was in the back seat behind Mr. Fips and Mr. Douglas was in the back seat behind Carolyn. When the [Petitioner] began shooting into the truck, Ida "duck[ed]" down and yelled at Mr. Douglas to get out of the car. Ida heard Mr. Fips saying "ouch, ouch" and then saw him fall over. Ida testified that, as she followed Mr. Douglas out of the vehicle, she fell and hurt her knee and that the vehicle ran over the side of her foot. The vehicle then coasted down the street and ran into a curb before stopping. Ida stated that no one inside Mr. Fips's vehicle had a gun, that no gunshots came from inside the vehicle, and that she was in fear when the [Petitioner] started shooting.

Following the shooting, Ida was transported to the hospital and treated for a fractured ankle. She also identified the [Petitioner] in a photo lineup that night. On cross-examination, Ida stated that she did not know if Mr. Fips put the vehicle in park before the shooting began. She also said that the [Petitioner] never pointed the gun directly at her or Mr. Douglas.

Michael Douglas testified that he lived next door to Mr. Fips for the five months preceding Mr. Fips's death. Mr. Douglas recalled that, on the day of the shooting, he went with Mr. Fips, Carolyn, and Ida to the dog track and estimated that they returned to Memphis around 10:00 p.m. Before going home, the group stopped at a liquor store, a convenience shop, and Church's Chicken. Mr. Douglas stated that, before leaving the parking lot of Church's Chicken, Mr. Fips looked at his cell phone and turned to Carolyn and asked, "[H]ow did he get my number?"

Mr. Douglas recalled that, on Hanley Street, Mr. Fips "coasted" by the [Petitioner]'s house. Mr. Douglas heard Carolyn say, "[N]o you don't have to do it like this here," and then he saw someone "just shooting at the car[.]" Mr. Douglas testified that he heard approximately three gunshots. He stated that he did not know the [Petitioner] and could not identify the shooter because it was "dark down there." Mr. Douglas recalled that he tried to open his door when the shooting started but the door would not open. He said Ida yelled at him to "get out of the car" and that they pushed at each other while trying to exit the vehicle. Mr. Douglas testified that he was afraid and that he fell after getting out of the vehicle. He then ran from the scene. Mr. Douglas testified that he did not have a weapon and that no one else inside the vehicle had a weapon. He further stated that he never knew Mr. Fips to carry a gun.

On cross-examination, Mr. Douglas testified that Mr. Fips purchased two small bottles of liquor while at the corner store. He recalled that, when they were ready to leave Church's Chicken, Mr. Fips took one of the bottles and "took a swallow of it[.]" Mr. Fips was looking at his cell phone, and he asked Carolyn, "[H]ow did he get my number?" Mr. Douglas agreed that it was dark outside by the time they returned to Hanley Street. He agreed that the interior light of Mr. Fips's vehicle was off and that the driver's window was partially down. Mr. Douglas recalled that Mr. Fips coasted down Hanley Street slowly, but he did not recall Mr. Fips's putting the vehicle in reverse before the shooting began. Mr. Douglas agreed that there were other ways to get to Mr. Fips's house from Church's Chicken other than going past the [Petitioner]'s residence.

Carolyn and the [Petitioner]'s thirteen-year-old son testified that, on June 17, 2013, he was standing across the street from the [Petitioner]'s house when he saw the [Petitioner] drag his mother "to the back of the house[.]" When he ran across the street to confront the [Petitioner], the [Petitioner] "walked off." He testified that the [Petitioner] had his hands around Carolyn's neck.

. . . .

Dr. Miguel Laboy testified that he worked in the Office of the Medical Examiner in Memphis and that he performed Mr. Fips's autopsy. Dr. Laboy determined the cause of death to be multiple gunshot wounds. Specifically, he found that Mr. Fips had two gunshot wounds to the chest, a gunshot wound to the right arm and buttock, and grazing wounds to the left hand and left arm. Dr. Laboy explained that the gunshot wounds to the chest fractured Mr. Fips's ribs and perforated his lungs and heart.

*Brown*, 2016 WL 1446221, at *3-7.

Following the conclusion of the proof, the jury found the Petitioner guilty of one count of first degree premeditated murder and three counts of aggravated assault. *Id.* at *7. The Petitioner timely filed a direct appeal, and this Court affirmed the trial court's judgment. *Id.* at *1. Our supreme court denied the Petitioner's application for permission to appeal on September 22, 2016.

Thereafter, the Petitioner filed a pro se petition for post-conviction relief, raising, among other claims, that he was denied the effective assistance of counsel in two areas: (1) trial counsel's failure to call a ballistics expert in the Petitioner's defense and (2) trial counsel's failure to cross-examine the State's witnesses properly. After an evidentiary hearing, the post-conviction court denied relief. The Petitioner appealed, arguing, in part, that his "post-conviction counsel had a conflict of interest that disqualified him from representing the Petitioner at the hearing[.]" *Brown v. State*, No. W2018-01705-CCA-R3-PC, 2020 WL 1877785, at *1 (Tenn. Crim. App. Apr. 15, 2020). On appeal, we agreed and remanded the case for a new evidentiary hearing. *Id.* at *1, *9.

On remand, the Petitioner filed an amended petition in which he raised additional allegations of ineffective assistance of counsel. More specifically, the Petitioner alleged that trial counsel was ineffective in failing to provide the Petitioner with the defense investigator's report and in not calling an individual named "Mac"[1] as a witness at trial. The post-conviction court held a new evidentiary hearing, and it heard testimony from both the Petitioner and his trial counsel.[2]

---

[1] The spelling of "Mac" varies throughout the record. We use the spelling adopted by the trial court and also by this Court in the first post-conviction appeal.

[2] Of the grounds raised in his original and amended petitions, the Petitioner presents only three of those grounds for review by this Court. As such, we do not address the resolution of any other issue originally brought by the Petitioner, but not presented on appeal. *See State v. Bristol*, __ S.W.3d __, No. M2019-00531-SC-R11-CD, 2022 WL 5295777, *3 (Tenn. 2022) ("[A]n appellate court's authority 'generally will extend only to those issues presented for review.'" (quoting Tenn. R. App. P. 13(b)).

The Petitioner testified that trial counsel did not deliver to him any discovery materials. He said that he gave trial counsel the "ins and outs" of his case by letting him know that the killing was not premeditated. In particular, the Petitioner said that the victim "made like a gun play [on the night of the shooting] and the victim "scared [him] basically."

The Petitioner testified that, on the night of the shooting, the victim drove past his home, placed his SUV in reverse, and called out to the Petitioner to come to his vehicle. The Petitioner said that once he was at the victim's vehicle, the victim threatened him and started reaching for something outside of the Petitioner's view. Due to his fear, the Petitioner began shooting at the victim. The Petitioner asserted that there was one piece of evidence that would help his claim that he was threatened by the victim: the defense investigator's report. When questioned about the report's significance, the Petitioner testified that the report contained "favorable information that would have helped [him] at trial." He concluded that the report "would prove that this wasn't premeditation, [but] it was like swept under the rug."

The Petitioner also testified to the need for a ballistics expert. According to the Petitioner, he requested that trial counsel hire a ballistics expert to show that another gun was present at the time of the shooting. The Petitioner stated that the victim was shot from left to right, as the Petitioner stood outside of the driver's side door and fired into the victim's vehicle. However, the medical examiner testified that the victim had a wound in his right buttocks, and according to the Petitioner, there was "no way possible that [he] did that. No way possible." The Petitioner asserted that had trial counsel hired a ballistics expert, "it would have prov[en] one of two things: it was another gun or it wasn't."

The Petitioner also testified about text messages between the victim and Mac. The Petitioner asserted that, in these text messages, the victim said, "I need a showstopper for this Chris guy." The Petitioner clarified that a "showstopper" was a gun. Because the Petitioner and the victim were not friends, the Petitioner reasoned that the victim was asking for a gun "to use on [the Petitioner]." The Petitioner said he hoped that trial counsel would call Mac to get a better understanding of the conversation that Mac had with the victim, but trial counsel never investigated the matter. The Petitioner also claimed that had Mac been present at trial, Mac would have shown that the victim "was plotting and planning to get a gun to do harm to [the Petitioner]." On cross-examination, the Petitioner conceded that he did not provide trial counsel with any information to help him investigate who, or where, Mac was.

Trial counsel testified that he had been a public defender for 23 years and that he had conducted "dozens" of jury trials on serious felony cases, including homicide cases. In recalling the facts of the Petitioner's case, trial counsel described the underlying situation as a "love triangle" that led to "several shots at night with people in the car." Trial

counsel testified that the Petitioner's version of events was that the victim, on the night of the shooting, "pistol played him. Like, acted like he [the victim] had a gun, but then he [the Petitioner] shot in fear."

Trial counsel testified that his strategy was to argue for conviction of a lesser-included offense. He claimed that "the State's position was it was premeditated and intentional and ours was that it was not. That it was an act of fear, maybe even justifiable."

He acknowledged that the Petitioner's case was difficult, as there were statements from eyewitnesses who knew the Petitioner and identified him. There was also proof from Ms. Pratcher identifying the Petitioner's intent before the shooting and also claiming that the Petitioner chased her after the shooting. In addition, trial counsel testified that he lost the "battle" to exclude Rule 404(b) evidence and that there were "considerable priors." Trial counsel stated that he attempted to establish a defense that the Petitioner believed the victim had a weapon in the vehicle on the night of the shooting.

While being questioned about his investigation, trial counsel stated that he hired a defense investigator and that she spoke to at least one of the State's witnesses before trial. He could not recall if the Petitioner had been given a copy of the report created by the investigator, but he noted that "as a general rule," he gave "all of [his] investigations to [his] clients."

Trial counsel testified that he did not recall Ms. Pratcher's statement to the investigator, but he recalled that her testimony was "damaging to the [Petitioner's] case." On re-direct examination, trial counsel acknowledged that he "probably should have" cross-examined Ms. Pratcher with the investigator's report, "but [he] didn't."

Although the Petitioner claimed a ballistics expert was discussed with trial counsel, trial counsel testified he did not "remember that at all." On cross-examination, trial counsel testified that, if he believed an expert was needed in the Petitioner's case, then he would have sought one.

With respect to the issues surrounding Mac, trial counsel testified that he could not recall if he had any information to locate Mac, or if he had ever contacted Mac. Trial counsel recalled that the only information he had on Mac was "one text message and a phone number." Nevertheless, trial counsel stated that at trial, he "got into" the victim looking for a "showstopper."

Upon the conclusion of the proof, the post-conviction court entered a written order denying the post-conviction petition. The court found that trial counsel's "performance was [not] prejudicially deficient." Accordingly, the court denied post-conviction relief. The Petitioner filed a timely appeal.

In this second appeal, the Petitioner challenges the post-conviction court's denial of his request for relief, asserting that his trial counsel was ineffective in three areas: (1) trial counsel failed to provide the Petitioner with the defense investigator's report before trial and failed to use the same report during cross-examination of Ms. Pratcher; (2) trial counsel failed to call a ballistics expert as a defense witness; and (3) trial counsel failed to investigate the victim looking for a "showstopper" before the shooting. The State asserts that the Petitioner failed to present proof to the post-conviction court to support the Petitioner's ineffective assistance of counsel claims and that he is therefore not entitled to relief. We agree with the State, and for the reasons given below, we affirm the judgment of the post-conviction court.

## STANDARD OF APPELLATE REVIEW

Our supreme court has recognized that "the first question for a reviewing court on any issue is 'what is the appropriate standard of review?'" *State v. Enix*, __ S.W.3d __, No. E2020-00231-SC-R11-CD, 2022 WL 4137238, at *4 (Tenn. Sept. 13, 2022). As our supreme court has made clear,

> Appellate review of an ineffective assistance of counsel claim is a mixed question of law and fact that this Court reviews de novo. Witness credibility, the weight and value of witness testimony, and the resolution of other factual issues brought about by the evidence are entitled to a presumption of correctness, which is overcome only when the preponderance of the evidence is otherwise. On the other hand, we accord no presumption of correctness to the post-conviction court's conclusions of law, which are subject to purely de novo review.

*Phillips v. State*, 647 S.W.3d 389, 400 (Tenn. 2022) (citations omitted).

## ANALYSIS

The Tennessee Post-Conviction Procedure Act provides an avenue for relief "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. A post-conviction petitioner has the burden of proving his or her allegations of fact by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). For evidence to be clear and convincing, "it must eliminate any 'serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Arroyo v. State*, 434 S.W.3d 555, 559 (Tenn. 2014) (quoting *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012)).

Article I, section 9 of the Tennessee Constitution establishes that every criminal defendant has "the right to be heard by himself and his counsel." Similarly, the Sixth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, guarantees that all criminal defendants "shall enjoy the right . . . to have the [a]ssistance of [c]ounsel." "These constitutional provisions guarantee not simply the assistance of counsel, but rather the reasonably effective assistance of counsel." *Nesbit v. State*, 452 S.W.3d 779, 786 (Tenn. 2014). A petitioner's claim that he or she has been deprived "of effective assistance of counsel is a constitutional claim cognizable under the Post-Conviction Procedure Act." *Moore v. State*, 485 S.W.3d 411, 418 (Tenn. 2016); *see also Howard v. State*, 604 S.W.3d 53, 57 (Tenn. 2020).

"To prevail on a claim of ineffective assistance of counsel, a petitioner must establish both that counsel's performance was deficient and that counsel's deficiency prejudiced the defense." *Moore*, 485 S.W.3d at 418-19 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). A petitioner may establish that counsel's performance was deficient by showing that "'counsel's representation fell below an objective standard of reasonableness.'" *Garcia v. State*, 425 S.W.3d 248, 256 (Tenn. 2013) (quoting *Strickland*, 466 U.S. at 688). As our supreme court has also recognized, this Court must look to "'all the circumstances'" to determine whether counsel's performance was reasonable and then objectively measure this performance against "the professional norms prevailing at the time of the representation." *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015) (quoting *Strickland*, 466 U.S. at 688).

"If the advice given or services rendered by counsel are 'within the range of competence demanded of attorneys in criminal cases,' counsel's performance is not deficient." *Phillips*, 647 S.W.3d at 407 (quoting *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). Notably, because this inquiry is highly dependent on the facts of the individual case, "[c]onduct that is unreasonable under the facts of one case may be perfectly reasonable under the facts of another." *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999).

In addition, a petitioner must establish that he or she has been prejudiced by counsel's deficient performance such that counsel's performance "'render[ed] the result of the trial unreliable or the proceeding fundamentally unfair.'" *Kendrick*, 454 S.W.3d at 458 (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993)). In other words, the petitioner "must establish 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Davidson v. State*, 453 S.W.3d 386, 393-94 (Tenn. 2014) (quoting *Strickland*, 466 U.S. at 694). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Howard*, 604 S.W.3d at 58 (quoting *Strickland*, 466 U.S. at 694).

Because a post-conviction petitioner bears the burden of establishing *both* deficient performance and resulting prejudice, "a court need not address both concepts if the petitioner fails to demonstrate either one of them." *Garcia*, 425 S.W.3d at 257. Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice[,] . . . that course should be followed." *Strickland*, 466 U.S. at 697; *see also Phillips*, 647 S.W.3d at 401 ("The petitioner must prove sufficient facts to support both the deficiency and prejudice prongs of the *Strickland* inquiry—or, stated another way, the post-conviction court need only determine the petitioner's proof is insufficient to support one of the two prongs to deny the claim.").

Importantly, when considering a claim of ineffective assistance of counsel, this Court begins with "the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all strategic and tactical significant decisions," *Davidson*, 453 S.W.3d at 393, and "[t]he petitioner bears the burden of overcoming this presumption," *Kendrick*, 454 S.W.3d at 458. This Court will "not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings." *Berry v. State*, 366 S.W.3d 160, 172 (Tenn. Crim. App. 2011) (citation omitted). Of course, "the fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation." *Goad*, 938 S.W.2d at 369. However, this Court will give deference to the tactical decisions of counsel only if counsel's choices were made after adequate preparation of the case. *Moore*, 485 S.W.3d at 419.

Again, we note that in the present case, the Petitioner alleges that he was denied the effective assistance of trial counsel in three areas. We address each of these issues in turn.

## A. FAILURE TO PROVIDE AND USE INVESTIGATOR'S REPORT

As to his first ground for post-conviction relief, the Petitioner asserts that he was denied the effective assistance of counsel with respect to his investigator's report in two ways: (1) that trial counsel did not deliver a copy of the report to him before the trial; and (2) that trial counsel did not use the information in the report to cross-examine Ms. Pratcher at trial. The Petitioner claims "there was valuable information in the report because Ms. Pratcher stated [the victim] threatened [the Petitioner] that night. [The Petitioner] said [the report] would show that this killing wasn't premeditated but that it was swept under the rug." For its part, the State contends that the Petitioner did not call Ms. Pratcher at the post-conviction hearing to show her testimony would have benefitted him at trial and that he did not offer any proof establishing that trial counsel provided him with the report after trial.

It is unclear when the Petitioner received the investigator's report.  The Petitioner asserts that he did not receive the report before trial, but trial counsel testified that "as a general rule," he gave "all of [his] investigations to [his] clients."  The post-conviction court did not make a specific finding on this point.

In any event, when a post-conviction petitioner claims that trial counsel did not disclose pretrial discovery to him or her, the petitioner cannot establish prejudice unless the petitioner shows how knowledge of that discovery would have affected the outcome of the proceeding.  *See, e.g.*, *Birdwell v. State*, No. M2012-02062-CCA-R3-PC, 2013 WL 6405733, at *6 (Tenn. Crim. App. Dec. 6, 2013).  Here, the Petitioner did not show the post-conviction court how his actual possession of the investigator's report at an earlier time would have changed the outcome of his trial.  For example, he did not show that his earlier receipt of this report would have affected the defense strategy, *see Bishop v. State*, No. W2017-00709-CCA-R3-PC, 2018 WL 2228195, at *6 (Tenn. Crim. App. May 15, 2018); that "his objectives were not accomplished by trial counsel's representation" due to the late receipt, *see McWilliams v. State*, No. E2017-00275-CCA-R3-PC, 2017 WL 5046354, at *4 (Tenn. Crim. App. Nov. 2, 2017); or that other benefits would have been obtained with the earlier disclosure, *see Johnson v. State*, No. E2019-02259-CCA-R3-PC, 2021 WL 5834385, at *13 (Tenn. Crim. App. Dec. 9, 2021).  We conclude that the post-conviction court properly denied relief on this basis.

The Petitioner also asserts that trial counsel was ineffective in failing to impeach the State's witness, Ms. Pratcher, with a prior statement that was contained in the investigator's report.  More specifically, the Petitioner notes that the report states, "[Ms. Pratcher] never heard [the victim] call out or threaten [the Petitioner] at all except for the night of the shooting."  The Petitioner contends that this statement proves that the victim "threatened" him on the night of the shooting and that, as such, the Petitioner was not the initial aggressor.  Trial counsel testified that it was unclear what Ms. Pratcher actually meant by the statement contained in the report.

This Court has repeatedly held that trial counsel's decision as to the manner of and subject matter of cross-examination "is a strategical or tactical choice, if informed and based upon adequate preparation."  *Pierce v. State*, No. M2005-02565-CCA-R3-PC, 2007 WL 189392, at *7 (Tenn. Crim. App. Jan. 23, 2007) (citing *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982)).  Furthermore, "strategic decisions during cross-examination are judged from counsel's perspective at the point of time they were made in light of all the facts and circumstances at that time."  *Reeves v. State*, No. M2004-02642-CCA-R3-PC, 2006 WL 360380, at *10 (Tenn. Crim. App. Feb. 16, 2006).

When evaluating the performance of trial counsel on cross-examination, the petitioner must show "what additional beneficial evidence could have been elicited" through his or her preferred cross-examination.  *See Ortiz v. State*, No. M2020-01642-

CCA-R3-PC, 2021 WL 5080514, at *4 (Tenn. Crim. App. Nov. 2, 2021), *perm app. denied* (Tenn. Jan. 14, 2022). In addition, the petitioner must also present that witness at the post-conviction evidentiary hearing to show how the witness would have responded to trial counsel's questioning. *See Britt v. State*, No. W2016-00928-CCA-R3-PC, 2017 WL 1508186, *4, *7 (Tenn. Crim. App. Apr. 25, 2017) ("[T]he Petitioner did not present Ms. Tackett's testimony at the post-conviction hearing to show how she would have responded had trial counsel asked about her inability to see the fight. . . . The Petitioner has failed to prove . . . that there is any reasonable probability of another outcome had trial counsel cross-examined Ms. Tackett differently.").

In this case, the Petitioner did not call Ms. Pratcher as a witness at the post-conviction hearing. This omission is significant. Without Ms. Pratcher's testimony, we cannot know how she would have responded had trial counsel asked the additional questions suggested by the Petitioner. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Respectfully, we decline to speculate as to how Ms. Pratcher would have answered had she been asked about the single statement in the investigator's report. We therefore affirm the judgment of the post-conviction court denying post-conviction relief on this ground.

## B.    BALLISTICS EXPERT

Next, the Petitioner alleges that trial counsel was ineffective by failing to call a ballistics expert to testify in his defense. The Petitioner testified at the evidentiary hearing that a ballistics expert was needed to establish his belief that the victim had a gun on his person the night of the shooting. The Petitioner claims that a ballistics expert would have bolstered his argument for a lesser-included offense if the expert were able to testify that the victim possessed a gun at the time of the shooting.

It is well established that when a petitioner contends trial counsel failed to discover, interview, or present a witness in support of his defense, the petitioner must generally call that witness to testify at an evidentiary hearing. *Black*, 794 S.W.2d at 752. Indeed, this is the only way the petitioner can establish:

> that (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness inured to his prejudice, or (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner.

- 13 -

*Id.* at 757; *see also Taylor v. State*, 443 S.W.3d 80, 85 (Tenn. 2014) ("Our Court of Criminal Appeals has observed that, '[a]s a general rule, . . . the only way [a] petitioner can establish' that trial counsel improperly failed to interview a witness is by calling the witness to testify at the post-conviction hearing." (quoting *Black*, 794 S.W.2d at 757 and alterations and omission in original)). Thus, even if a petitioner is able to show counsel was deficient in the investigation of the facts or in failing to call a known witness, the petitioner is not entitled to post-conviction relief unless he also produces that material witness at his post-conviction evidentiary hearing who "(a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called." *Black*, 794 S.W.2d at 758.

These principles apply equally to claims that trial counsel should have retained or called an expert witness to testify. *See, e.g.*, *Delosh v. State*, No. W2019-01760-CCA-R3-PC, 2020 WL 5667487, *1, *9 (Tenn. Crim. App. Sept. 23, 2020), *perm. app. denied* (Tenn. Jan. 14, 2021); *Canales v. State*, No. E2020-01040-CCA-R3-PC, 2021 WL 3363454, at *5 (Tenn. Crim. App. Aug. 3, 2021), *perm. app. denied* (Tenn. Nov. 12, 2021). However, the Petitioner here did not present the testimony of a ballistics expert at the post-conviction hearing. Because we may not speculate as to how this expert would have testified had the witness been presented, we affirm the judgment of the post-conviction court denying post-conviction relief on this ground. *See Banks v. State*, No. W2020-01164-CCA-R3-PC, 2021 WL 4786373, at *9 (Tenn. Crim. App. Oct. 14, 2021) ("Petitioner contends that trial counsel was ineffective for failing to retain an independent ballistics expert to rebut the State's ballistics expert witness. Petitioner acknowledges that he failed to establish how he was prejudiced by trial counsel's decision not to retain an expert by not presenting the testimony of an expert at the post-conviction hearing." (citing *Black*, 794 S.W.2d at 757)).

## C.     INVESTIGATION OF A "SHOWSTOPPER"

Finally, the Petitioner argues that trial counsel was ineffective by failing to investigate that the victim was looking for a "showstopper" before the shooting. At the post-conviction hearing, the Petitioner testified that the victim told Mac that he needed "a showstopper for this Chris guy." From this, the Petitioner asserts that if trial counsel had located Mac and called him to testify, Mac would have established that the victim "was plotting and planning to get a gun to harm [the Petitioner]."

As with his ballistics expert, however, the Petitioner did not call Mac to testify at the post-conviction hearing. As noted above, we cannot speculate as to how Mac would have testified had he been called as a witness at trial. *Black*, 794 S.W.2d at 757. As such, we affirm the judgment of the post-conviction court denying post-conviction relief on this ground.

**CONCLUSION**

In summary, we hold that the post-conviction court properly found that the Petitioner was not denied the effective assistance of counsel during his trial. Accordingly, because the Petitioner's conviction or sentence is not void or voidable because of a violation of a constitutional right, we affirm the denial of post-conviction relief in all respects.

_____

TOM GREENHOLTZ, JUDGE